# Illinois Official Reports

## Appellate Court

*People v. Sheley*, 2017 IL App (3d) 140659

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. NICHOLAS T. SHELEY, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-14-0659 |
| Filed | October 27, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Whiteside County, No. 08-CF-402; the Hon. Jeffrey W. O'Connor, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Thomas A. Lilien, and Fletcher P. Hamill, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Lisa Madigan, Attorney General, of Chicago (Garson S. Fischer, Assistant Attorney General, of counsel), for the People. |
| Panel | JUSTICE SCHMIDT delivered the judgment of the court, with opinion.<br>Presiding Justice Holdridge specially concurred, with opinion.<br>Justice O'Brien dissented, with opinion. |

**OPINION**

¶ 1    Defendant, Nicholas T. Sheley, appeals his conviction of four counts of first degree murder. Specifically, defendant contends that the circuit court erred in denying his motion for a mistrial because reversible error occurred when the judge fell asleep during the jury trial. We affirm.

¶ 2                                                    FACTS

¶ 3    The State charged defendant with 15 counts of first degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2008)) for causing the deaths of Dayan Blake, Brock Branson, Kilynna Blake, and Kenneth Ulve. With regard to the murder of Dayan, the indictment alleged that Dayan was under 12 years old and his death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty as set forth in section 9-1(b)(7) of the Criminal Code of 1961 (720 ILCS 5/9-1(b)(7) (West 2008)).

¶ 4    A jury trial was held. The evidence at trial showed that the four victims were last seen alive in their apartment in Rock Falls, Illinois, on the evening of June 28, 2008. Two days later, the bodies of the victims were found in their apartment. The victims had been bludgeoned to death.

¶ 5    The State also presented evidence that on the morning of June 28—prior to the murders of the victims in the instant case—defendant stole a truck, a work shirt, and a hat from Illinois Oil Products in Rock Island, Illinois. Defendant drove the truck to Galesburg, where he murdered Ronald Randall and then stole Randall's truck. The State presented a videotaped deposition of Pamela Sebben. Sebben was a gas station clerk who sold cigarettes to defendant on June 28 in Galesburg.

¶ 6    When the police searched the victims' apartment, officers found the work shirt that defendant stole from Illinois Oil Products. The shirt contained DNA consistent with that of defendant and was stained with Randall's blood. The officers also found pair of khaki shorts in the apartment. Testing revealed that the inside of the waistband of the shorts contained defendant's DNA. The shorts were stained with Ulve's and Randall's blood. Additionally, officers found two cigarette butts that contained defendant's DNA.

¶ 7    Two shirts and a pair of shorts belonging to Branson were missing from the apartment. A police officer found those items in a dumpster in Festus, Missouri. The clothing contained DNA consistent with that of defendant. One of the shirts contained several bloodstains. Testing showed that the bloodstains contained the DNA of Ulve, Branson, and Kilynna. The State also introduced photographs of defendant in St. Louis, Missouri, on June 29. In those photographs, defendant was wearing one of Branson's missing shirts.

¶ 8    Officer Brad Cirimotich testified regarding security camera footage purportedly showing defendant in Galesburg on June 28. Cirimotich testified regarding the contents of the security camera footage while the videotapes were being played. After the videos ended, the following exchange occurred:

> "MR. ELWARDS [*sic*] [Assistant Attorney General]: Judge, we can have the lights back up.
>
> MR. KARLIN [defense counsel]: Judge?
>
>                    (Counsel Karlin approached the bench.)
>
> MR. KARLIN: Judge O'Connor?

(Counsel Elward approached the bench.)

MR. ELWARD: Judge, could we get the lights back on?

THE COURT: Hmm.

MR. ELWARD: We need the lights back on.

(The Court complies.)

MR. ELWARD: Thank you.

Judge, I've got some chain exhibits that I need to do with Detective Cirimotich, perhaps this might be a good time for us to break for lunch and bring the jury back after that.

THE COURT: Excellent time.

Jeremy, 1:15?

MR. KARLIN: Sure."

¶ 9     A lunch recess was taken, and then the following proceedings were held while the jury was out of the courtroom:

"MR. KARLIN: Judge, I apologize for having to do this, but as you can appreciate the position that I'm in, I have to make a record of this.

There was a point at the ending of the hearing or the trial session this morning when the video was being played and Officer Cirimotich was testifying on, I think it was apparent that you had fallen asleep.

I, I wrote down on my notes that I called twice from counsel—when I observed that you had fallen asleep, and I don't know how long you were, that I called, I said, Judge, from counsel table, I believe, twice. That at then when you did not respond I was concerned. I came to the bench, I called, I said Judge, to you again, you, and after that was when the clerk either, I think poked you and then you awoke.

Frankly, this is not the first time that I've observed this, but certainly not to the degree that I observed this morning and I have to make a record of that.

THE COURT: Understandable. Did your suggestion disrupt in any way the video[?]

MR. KARLIN: I believe, Judge, at that point we had, we reached a breaking point of the video.

MR. ELWARD: That is correct, Judge.

MR. KARLIN: And you were not called upon to make any evidentiary rulings during the playing of the video.

I think we—yeah, I think those two things are accurate.

THE COURT: Comments from the State?

MR. ELWARD: Judge, I share Mr. Karlin's observations. I was focused on Detective Cirimotich. I would just inquire as to the Court's health, if you are okay, we can proceed. It is of concern, obviously, just want to, just wanted to make sure that we are good to go for this afternoon.

* * *

THE COURT: Okay.

I will speak to the record that I have no physical inabilities at this point, that I'm aware of and, if the record shows no objections that I was required to respond to, while the videos were going on, and I don't think there were any or I would have been aware of them. Your observation is noted for the record."

¶ 10    On the next day of trial, defense counsel made an oral motion for a mistrial based on the incident where the judge appeared to have fallen asleep during Cirimotich's testimony. Defense counsel noted that he did not believe that was the first time the judge had "drifted off." The State agreed that the judge "appeared to be asleep during the examination of Brad Cirimotich." The State argued that defendant's motion for a mistrial was inappropriate because the occurrence of the judge falling asleep did not constitute "anything fundamental that affect[ed] this Defendant's rights." The circuit court denied the motion for a mistrial.

¶ 11    The jury ultimately found defendant guilty of first degree murder for all four murders. The circuit court sentenced defendant to four consecutive sentences of natural life imprisonment without parole.

¶ 12    Defendant filed a motion for a new trial arguing, *inter alia*, that the court erroneously denied his motion for a mistrial "for allegations that the judge fell asleep on multiple occasions and appeared to be confused for the reasons stated verbally and/or in writing to the court." The circuit court denied the motion. The court explained:

"This phrase in here 'on multiple occasions', I regard as gratuitous, because nowhere in this record did the defense make any objection whatsoever to multiple occasions of what they perceived. On the one occasion that they did make a record on what their perceptions were I want to explain the circumstances. It was a video deposition. There was nothing evidentiary about the video aspect of this other than an above-the-waist head and shoulders shot of the witness that was testifying. No evidentiary value of that at all.

If the jury, who are fact-finders in this case, chose to assess her credibility on based [*sic*] what they viewed, so be it, but they are the finders of fact.

So if I was not looking at the video, that does not mean that I was not listening and hearing everything that was being said, and I find that the allegations that I fell asleep on multiple occasions to be feckless, factually unsupported, and, in fact, factually inaccurate, because I am the one that knows. And frankly, the insertion in this motion for new trial for the first time an allegation of multiple occasions, which does not appear anywhere else in this record, I find to be a desperate claim of error by a desperate defense on that particular issue.

The test on that is whether the judge ever lost control of the courtroom in these proceedings, and the answer to that is absolutely not. No one spoke in the courtroom during this deposition. There were no objections, there was nothing for the Court to rule on other than to sit there and listen to what this deposition witness had to say, and that was the end of that.

And the press had a field day with that one. I don't like to think that all journalists are yellow journalists, but to pick that out, when most of the reporters weren't even present here, and then run with it in the press, I found to be a little bit out of bounds. So, the issue there was not the deposition. It was not the evidence that was heard. It's this assertion that I was asleep. And it's feckless, it's inaccurate, and that's my record for

the appellate court. I find it disgusting."

¶ 13                                    ANALYSIS

¶ 14      Defendant argues that the circuit court abused its discretion in denying his motion for a mistrial because *per se* reversible error occurred when the trial judge fell asleep during Cirimotich's testimony. We find that a judge falling asleep during a trial does not constitute *per se* reversible error. After a review of the totality of the circumstances, we find that the circuit court did not abuse its discretion because defendant failed to show that he was prejudiced.

¶ 15      "Generally, a mistrial should be awarded where there has been an error of such gravity that it has infected the fundamental fairness of the trial, such that continuation of the proceeding would defeat the ends of justice." *People v. Sims*, 167 Ill. 2d 483, 505 (1995). A circuit court's decision to deny a motion for a mistrial is reviewed for abuse of discretion. *Id.*

¶ 16      "[A]utomatic reversal is only required where an error is deemed 'structural,' *i.e.*, a systemic error which serves to 'erode the integrity of the judicial process and undermine the fairness of the defendant's trial.' " *People v. Glasper*, 234 Ill. 2d 173, 197-98 (2009) (quoting *People v. Herron*, 215 Ill. 2d 167, 186 (2005)). An error is structural "only if it necessarily renders a criminal trial fundamentally unfair or an unreliable means of determining guilt or innocence." *People v. Thompson*, 238 Ill. 2d 598, 609 (2010).

> "[M]ost errors of constitutional dimension are subject to a harmless error analysis. Only those constitutional violations that are 'structural defects in the constitution of the trial mechanism,' such as total deprivation of the right to trial counsel or absence of an impartial trier of fact, are *per se* error that necessitate remandment for a new proceeding." *People v. Shaw*, 186 Ill. 2d 301, 344-45 (1999) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991)).

¶ 17      We hold that a judge falling asleep for a portion of a trial does not rise to the level of structural error. That is, such an error does not "necessarily render[ ] a criminal trial fundamentally unfair or an unreliable means of determining guilt or innocence." *Thompson*, 238 Ill. 2d at 609. Rather, such an error is subject to harmless error analysis. We find support for our holding in the decisions of other jurisdictions, which held that a judge falling asleep during trial did not constitute reversible error unless the defendant could establish prejudice. *Lampitok v. State*, 817 N.E.2d 630, 641 (Ind. Ct. App. 2004); *United States v. White*, 589 F.2d 1283, 1289 (5th Cir. 1979).

¶ 18      Having found that the issue of a judge falling asleep during trial is subject to harmless error analysis, we determine that the judge's falling asleep in the instant case was harmless. It is undisputed that neither party called upon the judge to make any evidentiary rulings during that time. Additionally, the evidence of defendant's guilt was overwhelming. Police officers discovered cigarettes and clothing containing defendant's DNA in the victims' apartment. Some of the clothing was stained with the victims' blood. Additionally, officers found clothing containing defendant's DNA and the victims' blood in the dumpster in Festus. The State also introduced photographs of defendant wearing one of the victims' shirts the day after the murders.

¶ 19      When ruling on defendant's posttrial motion, the trial judge noted that defense counsel made a record of his observations that the trial judge had fallen asleep on only one occasion,

which occurred during a video deposition. Presumably, the circuit court was referring to Sebben's video deposition. However, the record shows that the incident of which defense counsel made a record occurred during Cirimotich's testimony when security camera videos were being played. It is unclear whether the judge was merely mistaken as to which video was playing when he fell asleep or whether he fell asleep on both occasions. We note, however, that neither party called upon the judge to make any evidentiary rulings while Sebben's video deposition played. Additionally, neither party stated on the record that the judge had fallen asleep at that time.

¶ 20    We note that defendant argues the record "strongly suggests" that the judge fell asleep on multiple occasions during trial, though the occasion during Cirimotich's testimony was the most egregious instance. Defendant bases this argument on defense counsel's repeated statements that he believed he had observed the judge fall asleep more than once. However, defendant provides no further details regarding these incidents. Thus, defendant has not shown that he was prejudiced by these alleged additional incidents.

¶ 21    Because the evidence in this case was overwhelming and the parties did not call upon the trial judge to make any evidentiary rulings at a time when the judge was asleep, the judge falling asleep was harmless error. Thus, the circuit court did not abuse its discretion on denying defendant's motion for a mistrial.

¶ 22    In reaching our holding, we reject defendant's reliance on *People v. Vargas*, 174 Ill. 2d 355 (1996). In *Vargas*, the judge left the bench during a jury trial to take a phone call while a witness continued testifying. *Id.* at 358-60. The *Vargas* court held that "the nature of the error—total judicial absence for a portion of a felony trial—is *per se* reversible because such error is inherently prejudicial, not only to defendant's right to a fair trial but also to the integrity of the judicial process." *Id.* at 366. The court reasoned that the following policy concerns supported its holding:

> "First, a judge's active presence on the bench during a criminal jury trial is an essential safeguard which aids in providing a defendant with a fair trial. Second, we believe that a judge's absence from the bench might unduly influence the attitude of jurors so as to deny defendant an impartial trial." *Id.* at 364.

¶ 23    In rejecting the State's argument that harmless error analysis should apply, the court reasoned:

> "We conclude that, because of the significant public and private interests involved in a criminal jury trial, a harmless error rule standard of reviewing a judge's complete absence from the bench is ill-advisable in felony cases. A defendant's liberty, as well as the State's interest in convicting the guilty, are at stake in every criminal trial. A presiding judge's supervision over every stage of the proceedings precludes speculation that jurors may perceive evidence received in the judge's absence as less significant, and impresses upon jurors the importance of the interests of the State and the defendant. A rule that a trial judge's absence from the proceedings is harmless would open the door to abuses which could hinder those interests and undermine public confidence in judicial proceedings. In our view, only a rule which requires reversal when a judge totally absents himself or herself from the proceedings will effectively remove any incentive which might otherwise exist for the judge to disregard the significant interests involved in a criminal trial." *Id.* at 371-72.

¶ 24    We find that the policy concerns underlying the holding in *Vargas* do not apply in situations, as in the instant case, where a judge falls asleep on the bench. The *Vargas* court refused to apply harmless error analysis, in large part, to deter judges from abusing such a rule. See *id.* Unlike physically leaving the bench, which is always a voluntary act, falling asleep is often inadvertent. Thus, a rule of *per se* reversible error for a judge falling asleep during a trial would not have the same deterrent effect as in a situation where a judge chooses to physically leave the bench.

¶ 25    Additionally, a judge falling asleep during trial is far less likely to send a message to the jury that that portion of the trial is unimportant than a judge that physically leaves the bench. Jurors are more likely to attribute a judge falling asleep to the judge's health or other physical factors. See *White*, 589 F.2d at 1289. In the instant case, for example, the judge fell asleep while the lights were turned off and a video was playing. Assuming that the jury was even aware that the judge fell asleep, it likely attributed it to the darkness of the room and fatigue rather than to lack of interest in the proceedings. There is nothing in the record to indicate that the jury was aware of the incident.

¶ 26                                                      CONCLUSION

¶ 27    For the foregoing reasons, we affirm the judgment of the circuit court of Whiteside County.

¶ 28    Affirmed.

¶ 29    PRESIDING JUSTICE HOLDRIDGE, specially concurring.

¶ 30    I concur in the judgment and opinion of the court. I write separately because I would find that the defendant has waived his only issue on appeal by failing to properly address the issue during trial. The defendant claims that his counsel observed the judge fall asleep on "multiple occasions" with the Cirimotich testimony being only the most egregious instance. Assuming the defendant's statement that his counsel observed the judge sleeping on "multiple occasions" is true, the defendant has failed to explain why his counsel took no steps after any occasion to rectify this problem. There is no indication in the record that defense counsel tried to bring the issue to the attention of the judge at any time prior to his desire to "make a record" of the judge falling asleep during the Cirimotich video. The defendant would have this court believe that his counsel was powerless to bring his observations to the court at any time prior to making a record to preserve the issue for appeal. I disagree.

¶ 31    Defense counsel's tactic of not addressing the apparent problem of the judge falling asleep until it was time to "make a record" leads me to conclude that defense counsel was deliberately building error into the record, without giving the court any opportunity to address or prevent the error. The practice of deliberately building error into the record, a practice commonly known as "sandbagging," is strongly disfavored by our courts. *People v. David*, 96 Ill. App. 3d 419, 422 (1981); *Minemyer v. R-Boc Representatives, Inc.*, 283 F.R.D. 392, 397 (N.D. Ill. 2012). Sandbagging can result in the waiver or forfeiture of all issues, including purported violations of constitutional rights. *Stern v. Marshall*, 564 U.S. 462, 482 (2011) ("the consequences of 'a litigant … "sandbagging" the court—remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor' [citation]—can be particularly severe").

- 7 -

¶ 32    Given the facts here, I find that defense counsel "sandbagged" the trial judge by not bringing his observation of the trial judge's condition to immediate attention. I would further find that the only reason counsel did not address the issue at the soonest point possible, was his desire to "make a record." For this reason, I would find that the defendant invited the error that he claims on appeal requires a new trial. I would affirm the defendant's conviction.

¶ 33    JUSTICE O'BRIEN, dissenting.

¶ 34    I respectfully dissent. I would hold that a judge falling asleep for a portion of a trial constitutes *per se* reversible error under our supreme court's holding in *Vargas*. In *Vargas*, the judge left the bench during a portion of a criminal jury trial to take a phone call. *Vargas*, 174 Ill. 2d at 358-60. The *Vargas* court reasoned that this occurrence was *per se* reversible error based on policy concerns that (1) "a judge's active presence on the bench during a criminal jury trial is an essential safeguard which aids in providing a defendant with a fair trial," and (2) "a judge's absence from the bench might unduly influence the attitude of jurors so as to deny defendant an impartial trial." *Id.* at 364.

¶ 35    I believe that the judge falling asleep in the instant case was tantamount to the judge physically leaving the bench in *Vargas*. When a judge is asleep—just as when a judge is physically absent—the judge is unable "to supervise the courtroom, rule on objections as they arise during the course of the proceedings, and deter any objectionable conduct to the detriment of the defendant." *Id.* Without the "essential safeguard" of the "judge's active presence," a defendant's right to a fair trial is threatened. *Id.* A judge cannot be actively present on the bench when he is asleep.

¶ 36    Additionally, like when a judge is physically absent, a judge falling asleep during a witness's testimony "may create a negative impression in the minds of the jury to the detriment of the defendant." *Id.* at 365. Contrary to the majority's assertion, I believe that it is highly unlikely that the jury did not notice the judge falling asleep during Officer Cirimotich's testimony. Counsel called for the judge several times with no response. Defense counsel indicated that the judge was not roused until his clerk poked him. The judge falling asleep could have given the jurors the impression that the trial was unimportant or that they did not need to pay close attention to the testimony of the witness.

¶ 37    Because the same policy concerns underlying the court's holding in *Vargas* are equally applicable in the instant case, I believe that harmless error analysis is inappropriate. As the *Vargas* court reasoned, "[i]f such errors could never be held reversible as long as evidence of defendant's guilt is deemed overwhelming, there would be little need for courts of review to concern themselves with the fairness of prosecutions and the integrity of the judicial process." *Id.* at 370.

¶ 38    Although I believe that *Vargas* controls the disposition of this case and that it is unnecessary to look to the holdings of other jurisdictions, I note the recent decision of the Court of Appeals of Kansas in *State v. Johnson*, 391 P.3d 711 (Kan. Ct. App. 2017). In finding that a judge falling asleep during a criminal trial constituted structural error, the *Johnson* court reasoned as follows:

> "[T]here can be no court without a judge. How can the public have confidence in the outcome of a trial if the trial judge is napping? This is not an error in the presentation of evidence, nor is it an error in the instruction of the jury, nor is it like other trial issues where we examine them to see if they are harmless. This error affected the framework

of the entire trial. Our citizens expect a fully awake trial judge presiding over a criminal trial. This was structural error." *Id.* at 717-18.

¶ 39    In the instant case, *per se* reversible error occurred when the judge fell asleep during defendant's murder trial. Because this error infected the fundamental fairness of the trial, the trial court erred in denying defendant's motion for a mistrial. Therefore, I would reverse and remand for a new trial.

¶ 40    For the above reasons, I respectfully dissent.